IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

APPEAL NO. 23-10227-DD
_____

UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

KEVIN JONES

Defendant-Appellant.
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF FLORIDA
_____

INITIAL BRIEF OF APPELLANT
_____

A. Fitzgerald Hall, Esq.
Federal Defender
Middle District of Florida

Laura J. Daines, Esq.
Assistant Federal Defender
Florida Bar No. 105060
400 North Tampa Street,
Suite 2700
Tampa, Florida 33602
Telephone:     (813) 228-2715
Facsimile:     (813) 228-2562
E-Mail: laura_daines@fd.org
Counsel for Appellant

Appeal No. 23-10227-DD

*United States of America v. Kevin Jones*

CERTIFICATE OF INTERESTED PERSONS

The persons listed below are interested in the outcome of this case:

Berger, The Honorable Wendy W.

Daines, Laura Jessica

Doss, D. Todd

Hall, A. Fitzgerald

Handberg, Roger B.

Harrington, Jennifer Michele

Jones, Kevin

Jones, Melissa

Kidd, The Honorable Embry J.

Price, The Honorable Leslie Hoffman

Reyes, Karla

Rhodes, David P.

Seider, Germaine M.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Jones leaves to this Court's discretion whether oral argument is required in this case.

# TABLE OF CONTENTS

**Contents**                                                      **Page(s)**

Certificate of Interested Persons ............................................................ C1

Statement Regarding Oral Argument ....................................................... i

Table of Contents ................................................................................... ii

Table of Authorities............................................................................... iv

Statement of Subject Matter and Appellate Jurisdiction ....................... vi

Statement of the Issues.......................................................................... 1

Statement of the Case ............................................................................ 1

    I.    Course of Proceedings ............................................................ 1

    II.    Statement of the Facts ............................................................ 3

        A.    Offense Conduct .......................................................... 3

        B.    Sentencing.................................................................... 5

    III.    Standards of Review .............................................................. 12

Summary of the Arguments.................................................................... 13

Arguments and Citations of Authority .................................................. 16

    I.    The district court abused its discretion and violated Mr. Jones' right to due process by allowing an improper and unduly prejudicial victim impact statement..................................... 16

TABLE OF CONTENTS - *CONTINUED*

**Contents**                                                                **Page(s)**

II.   Mr. Jones' sentence is substantively unreasonable because
      the district court relied on improper factors in varying
      upward..................................................................................21

      A.   The district court improperly relied on a non-victim
           statement when varying upward.................................23

      B.   The district court improperly relied on unproven facts
           contained in arrest records when varying upward .....24

III.  Mr. Jones' § 922(g)(1) conviction should be vacated because
      the statute is unconstitutional under the Second Amendment
      facially and as applied to Mr. Jones .....................................32

      A.   The Supreme Court's decision in *Bruen* overhauled the
           analysis employed to determine whether a regulation is
           unconstitutional under the Second Amendment and
           abrogated this Court's Second Amendment
           precedent ....................................................................33

      B.   The plain text of the Second Amendment covers the
           conduct underlying Mr. Jones' § 922(g)(1)
           conviction....................................................................39

           1.   Mr. Jones is among the people whom the Second
                Amendment protects...........................................40

           2.   Mr. Jones' proposed course of conduct falls within
                the Second Amendment's plain text...................43

      C.   The government cannot show an American tradition
           that an individual with Mr. Jones' criminal history may
           never again possess any firearms or ammunition ......44

TABLE OF CONTENTS - *CONTINUED*

**Contents**                                                    **Page(s)**

IV.  For purposes of further review, Mr. Jones' conviction under § 922(g)(1) should be vacated because the statute exceeds Congress's authority under the Commerce Clause ............. 51

    A.  Section 922(g)(1) is facially unconstitutional ............. 52

    B.  Section 922(g)(1) is unconstitutional as applied ......... 54

Conclusion ............................................................. 56

Certificate of Compliance with Type-Volume Limit .............................. 57

Certificate of Service ......................................................... 57

iv

## TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Alderman v. United States*, 131 S. Ct. 700 (2011) .................................. 55

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................... *passim*

*Entler v. Gregoire*, 872 F.3d 1031 (9th Cir. 2017)................................... 41

*Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897

      (3d Cir. 2020)........................................................................... 46, 47

*Gamble v. United States*, 139 S. Ct. 1960 (2019)................................... 52

*GeorgiaCarry.Org. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) ............ 33

*Jennings v. State*, 5 Tex. Ct. App. 298 (1878)........................................ 49

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)....................... 40, 45, 46, 47

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003).................................... 37

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,

      142 S. Ct. 2111 (2022) ........................................................... *passim*

*Payne v. Tennessee*, 501 U.S. 808 (1991)......................................... 19, 23

*Range v. United States Att'y Gen.*, 69 F.4th 96,

      (3d Cir. 2023)........................................................... 41, 42, 43, 50

*Roberts v. United States*, 445 U.S. 552, 100 S. Ct. 1358 (1980) ............. 19

*Scarborough v. United States*, 431 U.S. 563 (1977)........................... 54, 55

TABLE OF AUTHORITIES - *CONTINUED*

**Cases**                                                    **Page(s)**

*United States v. Archer*, 531 F.3d 1347 (11th Cir. 2008)........................ 38

*United States v. Arroyo-Jaimes*, 608 F. App'x 843

(11th Cir. 2015) ...................................................................... 29, 30

*United States v. Baker,* 432 F.3d 1189 (11th Cir.2005),

*cert. denied,* 547 U.S. 1085, 126 S. Ct. 1809 (2006)...................... 12

*United States v. Bailey*, 547 F.2d 68 (8th Cir. 1976) ............................... 31

*United States v. Berry*, 553 F.3d 273 (3d Cir. 2009)................... 24, 29, 31

*United States v. Bullock*, --- F. Supp. 3d ---, 2023 WL 4232309

(S.D. Miss. 2023) ............................................................. 42, 44, 51

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) .......................... 33

*United States v. Cubero*, 754 F.3d 888 (11th Cir. 2014)......................... 12

*United States v. DeAngelis*, 243 F. App'x 471 (11th Cir. 2007)............. 12

*United States v. Díaz-Lugo*, 963 F.3d 145 (1st Cir. 2020) ...................... 30

*United States v. Foley*, 946 F.3d 681 (5th Cir. 2020).............................. 27

*United States v. Iguaran*, 821 F.3d 1335 (11th Cir. 2016) ..................... 13

*United States v. Irey*, 612 F.3d 1160 (11th Cir. 2010) ............................ 22

*United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022).......... 42

TABLE OF AUTHORITIES - *CONTINUED*

**Cases**                                                                          **Page(s)**

*United States v. Kuban*, 94 F.3d 971 (5th Cir. 1996) .............................55

*United States v. Lara*, 815 F.3d 605 (9th Cir. 2016) ..............................41

*United States v. Lopez*, 514 U.S. 549 (1995) ......................... 52, 53, 54, 55

*United States v. Marrero- Pérez*, 914 F.3d 20 (1st Cir. 2019)...........27, 28

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ......................33

*United States v. McDuffy*, 90 F.3d 233 (7th Cir. 1996) ..........................17

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) ............42

*United States v. Morrison*, 529 U.S. 598 (2000) ......................... 52, 53, 54

*United States v. Plate*, 839 F.3d 950 (11th Cir. 2016) ............................21

*United States v. Pritchett*, 327 F.3d 1183 (11th Cir. 2003) ....................52

*United States v. Quiroz*, 430 F. App'x 782 (11th Cir. 2011) ...................30

*United States v. Rahimi*, 61 F.4th 443 (5th Cir.),

    *writ of cert. granted*, 2023 WL 4278450 (June 30, 2023)...............37

*United States v. Reme*, 738 F.2d 1156 (11th Cir. 1984)................... 13, 19

*United States v. Ríos-Rivera*, 913 F.3d 38 (1st Cir. 2019)......................28

*United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) ............. 14, 38, 39

*United States v. Saac*, 632 F.3d 1203 (11th Cir. 2011) ..........................13

TABLE OF AUTHORITIES - *CONTINUED*

**Cases**                                                              **Page(s)**

*United States v. Santini-Santiago*, 846 F.3d 487 (1st Cir. 2017)........... 28

*United States v. Seekins*, 52 F.4th 988 (5th Cir. 2022) ................... 52, 54

*United States v. Toler*, 901 F.2d 399 (4th Cir. 1990) ............................. 17

*United States v. Tome*, 611 F.3d 1371 (11th Cir. 2010) ......................... 30

*United States v. Watts*, 519 U.S. 148 (1997) .......................................... 24

*United States v. Webman*, 760 F. App'x 904 (11th Cir. 2019) .......... 29, 30

*United States v. Williams*, 989 F.2d 1137 (11th Cir. 1993)................... 24

*United States v. Windless*, 719 F.3d 415 (5th Cir. 2013)................. 30, 32

*United States v. Wright*, 607 F.3d 708 (11th Cir. 2010) ....................... 54

## U.S. Constitution

U.S. Const. amend. I .................................................................. 41

U.S. Const. amend. II................................................................ *passim*

U.S. Const. amend. IV............................................................... 41

U.S. Const. amend. V ................................................................ 19

U.S. Const. amend. IX............................................................... 41

U.S. Const. amend. X ................................................................ 41

U.S. Const. amend. XIV ........................................................ 19, 32

TABLE OF AUTHORITIES - *CONTINUED*

**Statutes**                                                                  **Page(s)**

U.S. Const. art. I...................................................................................... 51

18 U.S.C. § 175 ............................................................................... 1, 16, 17

18 U.S.C. § 922 ................................................................................. *passim*

18 U.S.C. § 3231 ........................................................................................ vi

18 U.S.C. § 3553 ............................................................................. 11, 12, 21

18 U.S.C. § 3661 ................................................................................. 24, 27

18 U.S.C. § 3771 ...................................................................................... 17

18 U.S.C. § 3742 ........................................................................................ vi

28 U.S.C. § 1291 ........................................................................................ vi

**Rules**

Fed. R. App. P. 27....................................................................................57

Fed. R. App. P. 32....................................................................................57

Fed. R. Crim. P. 32 ..................................................................................18

**U.S. Sentencing Guidelines**

USSG § 2M6.1 .......................................................................................... 7

USSG § 3D1.2............................................................................................ 17

USSG § 4A1.3............................................................................... 24, 28

TABLE OF AUTHORITIES - *CONTINUED*

**U.S. Sentencing Guidelines**                                       **Page(s)**

USSG § 5K2.0 ............................................................................ 6

USSG § 5K2.9 ............................................................................ 6

USSG § 5K2.21 .......................................................................... 6

**Other**

Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev.
    1175, 1177 (1989) ........................................................... 38

C. Sunstein, *On Analogical Reasoning*, 106 Har. L. Rev. 741 (1993) .... 36

Carlton F.W. Larson, *Four Exceptions in Search of a Theory:*
    *District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings
    L.J. (2009) ....................................................................... 45

Catie Carberry, *Felons and Persons with a Mental Impairment*,
    Second Thoughts: A Blog from the Center for Firearms Law at Duke
    University (June 27, 2019) ............................................... 45

Crime Victims' Rights Act ................................................. 17, 18

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting*

    *Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249
    (2020) ............................................................................. 48

II Noah Webster, *An American Dictionary of the English Language*
    (1828) ............................................................................. 41

*Whether the Second Amendment Secures an Individual Right*,
    28 Op. O.L.C. 126, 226 (2004) ....................................... 48

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

This is a direct criminal appeal from the final judgment entered by the United States District Court for the Middle District of Florida, Orlando Division, on January 20, 2023. Doc. 84. The district court had jurisdiction under 18 U.S.C. § 3231.

Mr. Jones timely filed a notice of appeal on January 24, 2023. Doc. 87. This Court has jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

### STATEMENT OF THE ISSUES

I.   Whether the district court abused its discretion and violated Mr. Jones' right to due process by allowing an improper and unduly prejudicial victim impact statement.

II.   Whether Mr. Jones' sentence is substantively unreasonable because the district court relied on improper factors in varying upward.

III.   Whether Mr. Jones' § 922(g)(1) conviction should be vacated because the statute is unconstitutional under the Second Amendment facially and as applied to Mr. Jones.

IV.   For purposes of further review, Mr. Jones' conviction under § 922(g)(1) should be vacated because the statute exceeds Congress's authority under the Commerce Clause.

### STATEMENT OF THE CASE

## I.   COURSE OF PROCEEDINGS

Mr. Jones was charged by superseding information with one count of knowingly possessing ricin, a biological agent, toxin, and delivery system, in violation of 18 U.S.C. § 175(b). Doc. 53 at 1. He was also charged with one count of possession of a firearm, specifically a Ruger SR .22 and a Keystone Sporting Arms "My First Rifle," knowing he was previously convicted of a felony. *Id.* at 1-2. As prior offenses, the superseding information listed (1) three 1991 convictions for grand larceny, (2) four 1991 convictions for breaking and entering, (3) a 1991

1

conviction for uttering a forged check, and (4) two 1993 convictions for bad checks. *Id.*

Mr. Jones entered into a plea agreement in which he pleaded guilty to both counts of the superseding information. Doc. 55. The plea agreement contains an "appeal waiver" in which Mr. Jones agreed to waive the right to appeal his

> sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution . . . .

*Id.* at 12.

The district court accepted Mr. Jones' guilty plea. Doc. 59. During the January 11, 2023, sentencing, the district court calculated Mr. Jones' total offense level to be 21. Doc. 96 at 30. Factoring in a criminal history category of I, Mr. Jones' guidelines sentence was determined to be between 37- and 46-months' imprisonment. *Id.* The district court varied upward from the guidelines and imposed concurrent 120-month sentences as to each count. *Id.* at 63; Docs. 84-85.

## II.    STATEMENT OF THE FACTS

### A.    Offense conduct

On December 6, 2021, the FBI's Tampa division received a complaint regarding Mr. Jones from his then-wife, M.J., from whom he was separated. Doc. 55 at 17; PSR ¶ 13. M.J. told law enforcement that Mr. Jones had manufactured ricin, which is a biological toxin, which he planned to use to kill her. Doc. 55 at 17. M.J. learned this from Mr. Jones' fiancée, M.A., who told M.J. that Mr. Jones said he planned to put ricin in a toy water gun and spray it on M.J. in May of the following year. *Id.*; PSR ¶ 14.

M.J.'s attorney also reported the complaint to the Osceola County Sheriff's Office ("OCSO") on December 15, 2021. Doc. 55 at 18. The OCSO conducted interviews with M.J. and M.A. *Id.* M.A. advised law enforcement that Mr. Jones planned to spray M.J. with ricin he manufactured, then leave on vacation to provide an alibi. *Id.* M.A. also told law enforcement that the day of the interview, December 17, 2021, Mr. Jones called her and stated he would be leaving for Texas, where M.J. resided, that day. *Id.*

Law enforcement was conducting surveillance of Mr. Jones and saw him leave his house and enter his truck with several plastic containers resembling those described by M.A. as containing ricin. *Id.* at 19. Law enforcement stopped his vehicle and later searched both the vehicle and his residence. *Id.* The vehicle search revealed a water gun and liquid substances. *Id.* at 19-20. Liquids were also found in his residence. *Id.* at 20. Subsequent testing revealed that Mr. Jones had ricin in both his truck and residence. *Id.* Law enforcement also interviewed Mr. Jones, who admitted to manufacturing ricin. *Id.* at 19.

A few days later, on December 20, 2021, M.A. told detectives during another interview that Mr. Jones had a storage unit and had taken weapons to store there after agents visited the house. *Id.* at 21-22. Agents searched the storage unit on December 21, 2021, and found two pellet rifles, a Keystone Sporting Arms "My First Rifle," a Ruger SR. 22 handgun, 3,000 rounds of ammunition, and a firearm silencer. *Id.* at 22. The Ruger was manufactured outside of Florida, and the rifle had been purchased by an individual other than Mr. Jones in Colorado. *Id.* at 23. Mr. Jones knew that, although he previously had his civil rights restored by the Governor of Virginia, he was not allowed to possess firearms. *Id*.

### B.    Sentencing

Mr. Jones' sentencing was scheduled for January 11, 2023. Prior to sentencing, the parties submitted sentencing memoranda. Docs. 72-73. Mr. Jones highlighted for the district court that his prior felony convictions were over 30 years old, from when he was only 19 years old, and had been conditionally pardoned. Doc. 72 at 2; Doc. 72-1. He asserted that the language of the conditional pardon was confusing, and led him to mistakenly believe he could possess firearms. *Id.* Regardless, he noted that the firearms were his ex-wife's and he was holding them at a storage facility, where he did not have easy access to them, pending resolution of their divorce proceedings. *Id.*

Mr. Jones also explained that his actions in this case were the result of a cocaine addiction and difficult divorce. *Id.* at 6. Mr. Jones struggled with being denied his visitation rights during the divorce proceedings and began using drugs as an escape. *Id.* He made dangerous and illegal decisions, but had since remained clean and sober and begun to get his life back on track. *Id.*

Mr. Jones suffered from mental health issues from the time he was a teenager. *Id.* at 7. His mother, who struggled with substance abuse,

abandoned him. *Id.* This trauma, combined with the difficult divorce and separation from his daughter, contributed to his actions here. *Id.*

Notwithstanding Mr. Jones' trauma and mental health issues, he had a history of being a hard worker who earned a good income. *Id.* at 8. He had a substantial work history and believed he would regain employment quickly upon his release from prison, which would allow him to support his daughter and re-establish himself as a contributing member of society. *Id.* Considering all these factors, Mr. Jones asked the court to impose a sentence of 37 months' imprisonment and recommend the RDAP program. *Id.*

The government, on the other hand, asked the district court to impose a sentence of 120 months' incarceration for possession of ricin along with a concurrent 60-month sentence for possession of a firearm. Doc. 73 at 1. The government requested the district court depart or vary upward from the guidelines by 9 points "to account for" his "intent to use ricin as a weapon, his willingness, attempt, and ability to do so, the dangerousness posed by his actions, and his history and characteristics." *Id.* at 5. The government specifically cited to USSG §§ 5K2.9, 5K2.21, and 5K2.0(2)(B), as bases for a departure, arguing the facts surrounding Mr.

6

Jones' possession of ricin warranted an aggregate sentence of 120 months' imprisonment. *Id.* at 6-9.

During the sentencing hearing, Mr. Jones did not raise any objections to probation's calculation of the guidelines. Doc. 96 at 10. The government did object to probation's calculation and argued that Mr. Jones' conduct was tantamount to attempted murder, so USSG § 2M6.1(c)(2) should apply. *Id.* at 11. Mr. Jones argued the provision did not apply because he did not take a substantial step towards killing M.J. *Id.* at 15.

The district court described the issue as "a close call" so "g[a]ve the benefit to Mr. Jones" and did not apply the enhancement. *Id.* at 29. As a result, Mr. Jones' total offense level was calculated to be 21. *Id.* at 30. Combined with a criminal history category of I, his guidelines range was between 37- and 46-months' imprisonment. *Id.*

Mr. Jones took the opportunity to speak with the court prior to being sentenced. *Id.* at 33. He told the district court that at the time of the offense, he was going through a high-conflict divorce. *Id.* He expressed that he was angry and frustrated because he was repeatedly denied visitation with his daughter. *Id.* at 33-34. He was driving to Texas

on the day of the arrest under the advice of his family law attorney to enforce his parenting plan. *Id.*

The court also allowed M.J. to speak during the sentencing. Doc. 35. Mr. Jones objected to hearing victim-impact evidence, arguing that because the district court found the attempted murder enhancement did not apply, the offense conduct consisted only of possession and the crime was not one against a person with a victim. *Id.* at 95-96. The district judge overruled the objection, stating she believed Mr. Jones created the ricin with the intent to harm M.J. and would allow M.J. to speak. *Id.*

M.J. spoke to the district court at length about her relationship with Mr. Jones. *Id.* at 36-43. She described him as a monster who mentally abused her and her children and from whom she had to escape. *Id.* at 36-37. She described her experience through their contentious divorce. *Id.* at 37-39. She described his divorce from a prior wife. *Id.* at 40. She requested the district court impose the maximum sentence because she believed Mr. Jones was a man with no conscience and who was a danger to society. *Id.* at 43.

When she completed her statement, Mr. Jones renewed his objection and moved to strike her statement. *Id.* The district court

overruled the objection, stating it was "free to consider the nature and circumstances surrounding the offense." *Id.*

The government reiterated its request for a 9-level upward departure and/or variance, arguing it was justified, in part, because his criminal history score was underrepresented. *Id.* at 51. The government relied on the domestic violence arrests listed in the PSR, whose factual accuracy Mr. Jones objected to, stating M.A. reported physical abuse by Mr. Jones. *Id.* at 8; PSR ¶¶ 77-78. The government—despite presenting no evidence to support the disputed facts—contended it was required to show only a preponderance of the evidence. Doc. 96 at 53. It argued that just because the charges were dropped, did not mean the conduct did not happen. *Id.* The government stated:

> So when you consider the defendant's attempt to kill his soon-to-be ex-wife, that accounts for abuse, harassment, and domestic violence allegations at the minimum stemming from his last three romantic partners. That's who Kevin Jones is: an abuser and a danger to the public and, specifically, those close to him.

*Id.* at 54.

Mr. Jones objected to the argument that his criminal history category was underrepresented because it was not raised prior to sentencing and he did not have an opportunity to develop an argument

9

against it. *Id.* at 56. Mr. Jones further objected to consideration of events reported by his ex-wife or M.A. because the government did not provide any sworn testimony to support the unsubstantiated allegations in the PSR. *Id.* at 56-57.

The district court overruled the objection, reasoning that it "can consider the nature and circumstances of the offense but also the history and characteristics of the defendant, and all of those go to the history and characteristics of the defendant in this case." *Id.* at 57. With respect to Mr. Jones' criminal history category, the court stated the objection was overruled because Mr. Jones had a "significant criminal history that involves, you know, crimes of violence" that the court could consider. *Id.*

The court further stated "domestic violence in state court is a misdemeanor. You know, it doesn't—you know, I—I don't think that it's underscored. It's scored as it should be scored. And—but, you know, his criminal history is what it is." *Id.* at 58-59. Notably, however, Mr. Jones does not have a conviction for domestic violence. PSR ¶ 64-75. Rather, the domestic violence charges were only arrests and the cases dropped. *Id.* ¶¶ 77-78.

The district judge addressed the § 3553(a) sentencing factors prior to imposing a sentence. In doing so, the judge stated:

> But in weighing what an appropriate sentence is, you know, I look at the guidelines, your conduct in this case, the fear that you instilled, the fact that you're putting the public as well as Ms. Jones in danger, and you score 37 to 46 months, and I just—to me, that does not adequately reflect the seriousness of the offense in this case.
>
> You have 12 prior criminal convictions. Some of those were crimes of violence. You haven't been successful on your probation; and, in my view, you pose a risk to the community and there is a real need to protect the public from future harm. And while I certainly weighed factors in mitigation, to me, the aggravating circumstances with this case and with the crimes just outweigh the mitigation.

*Id.* at 62-63. Based on this explanation, the judge imposed and upward variance and sentenced Mr. Jones to 120-month terms of imprisonment for Counts 1 and 2 to run concurrently. *Id.* at 63. The district court also imposed a 3-year term of supervised release as to each count, also to run concurrently. *Id.*

Mr. Jones renewed his prior objections, and raised objections as to the procedural and substantive reasonableness of the sentence. *Id.* at 68. Mr. Jones is currently incarcerated pursuant to his sentence.

## III.  STANDARDS OF REVIEW

Sentences are reviewed for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). This Court reviews the reasonableness of a sentence for an abuse of discretion using a two-step process. *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014). First, it looks at "whether the district court committed any significant procedural error," which includes "selecting a sentence based on clearly erroneous facts." *Id.* If this Court determines the sentence is procedurally sound, it next examines "whether the sentence is substantively unreasonable under the totality of the circumstances and in light of the [18 U.S.C.] § 3553(a) factors." *Id.*

Additionally, "[d]uring a sentencing proceeding, due process allows a court to consider any information, even if it would not be admissible under the evidentiary rules, 'provided that the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence.'" *United States v. DeAngelis*, 243 F. App'x 471, 474 (11th Cir. 2007) (quoting *United States v. Baker,* 432 F.3d 1189, 1253 (11th Cir.2005)). A defendant alleging violation of due process rights during sentencing must

show that the disputed information is materially false or unreliable, and that the sentencing judge relied on the information. *United States v. Reme*, 738 F.2d 1156, 1167 (11th Cir. 1984).

The constitutionality of § 922(g)(1) is a jurisdictional question that was not waived by Mr. Jones' guilty plea. *United States v. Saac*, 632 F.3d 1203, 1208 (11th Cir. 2011) (holding constitutional challenge to statute of conviction was jurisdictional). Although "factfindings relevant to jurisdiction" are reviewed for clear error, "[t]he district court's subject matter jurisdiction is a question of law that [this Court] review[s] *de novo* even when it is raised for the first time on appeal." *United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016).

### SUMMARY OF THE ARGUMENTS

Because Mr. Jones was convicted of possession offenses with no identifiable, specific victim, M.J. was not a victim within the meaning of the Crime Victims' Rights Act. The district court therefore abused its discretion by permitting her to speak as a victim without requiring any indicia of reliability for her statements, and without her being subject to cross examination. This caused procedural error and a violation of Mr.

Jones' right to due process. As a result, Mr. Jones' sentence should be vacated.

Mr. Jones' sentence should also be vacated because it is substantively unreasonable. First, it is substantively unreasonable because the district court relied on the improper non-victim statement, which infused the sentencing proceeding with unfairness in violation of Mr. Jones' right to due process, when reaching its sentencing decision.

Mr. Jones' sentence should also be vacated as substantively unreasonable because the district court improperly relied on objected-to facts that were unproven and stemmed from prior arrests in imposing an upward variance.

Additionally, this Court should vacate Mr. Jones' conviction under § 922(g)(1) because it is unconstitutional under the Second Amendment, as applied, and under the Commerce Clause. The Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), abrogated this Court's prior precedent interpreting regulations challenged under the Second Amendment, including the decision in *United States v. Rozier*, 598 F.3d 768, 770-71 (11th Cir. 2010). This Court should revisit the issue and employ the standard delineated

by *Bruen*: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government then must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129-30. Because Mr. Jones is among the people notwithstanding his prior convictions, his conduct fell within the plain text of the Second Amendment, and the government cannot demonstrate the law is consistent with the nation's historical tradition of firearm regulation, the statute is unconstitutional as applied to Mr. Jones and his conviction must be vacated.

Alternatively, Mr. Jones' conviction under § 922(g)(1) should be vacated on the ground that the statute is unconstitutional, facially and as applied, because it exceeds Congress's authority under the Commerce Clause by not requiring that the criminal activity (i.e., possession) substantially affected interstate commerce. To prosecute Mr. Jones federally, the government relied on the firearms and ammunition having travelled in interstate commerce prior to his possession of them in Florida. The government did not establish any connection between the charged conduct of possessing the firearm and ammunition and

interstate or foreign commerce. Mr. Jones accordingly maintains, for purposes of further review, that § 922(g)(1) is unconstitutional because it exceeds Congress' authority under the Commerce Clause.

ARGUMENTS AND CITATIONS OF AUTHORITY

I.    **The district court abused its discretion and violated Mr. Jones' right to due process by allowing an improper and unduly prejudicial victim impact statement.**

Mr. Jones was charged with, and pleaded guilty to, a violation of § 175(b), which criminalizes the knowing possession of "any biological agent, toxin, or delivery system of a type or in a quantity that, under the circumstances, is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose . . . ."[1] Docs. 53, 55. The conduct criminalized by this provision is possession of substances, such as ricin, regardless of whether a person intends to use it as a weapon. *Compare* 18 U.S.C. § 175(b) (making possession of a biological agent an offense), *with id.* § 175(a) (making possession of a biological agent for use

---

[1] Mr. Jones was pleaded guilty to a second possession offense, specifically being a felon in possession of a firearm. Doc. 53, 55. Because M.J.'s victim impact statement related to the offense of possessing ricin, this argument focuses on that offense. However, Mr. Jones' offenses under §§ 175(b) and 922(g)(1), are both possession offenses without victims and the logic applies equally to both charges.

as a weapon an offense). In other words, the offense is one against society rather than a particular victim.

Crimes "for which society as a whole rather than a particular individual is harmed" are "[v]ictimless crimes." *United States v. McDuffy*, 90 F.3d 233, 237 (7th Cir. 1996) (citing USSG § 3D1.2, app. n. 2); *United States v. Toler*, 901 F.2d 399, 43 (4th Cir. 1990) (stating that "so called 'victimless' crimes—crimes in which society at large is a victim.") (citing USSG § 3D1.2).

The Crime Victims' Rights Act (the "CVRA" or "Act") provides rights to crime victims of charged offenses. 18 U.S.C. § 3771(b) ("In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection (a)."). A crime victim is defined as "a person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)(A). The term "offense" can refer to nothing other than the offense of conviction, and the specified use of the term "offense," rather than, for example, criminal conduct or conduct leading to criminal prosecution, forecloses any argument that the rights extend to victims of the overall conduct of the defendant.

17

The offense at issue in the instant case is possession of ricin in violation of § 175(b). M.J. is not a victim of Mr. Jones' offense of possession of ricin. His offense of possession did not proximately or directly harm M.J. Moreover, the district court found that the government did not establish that an enhancement for attempted murder applied because the evidence did not show a substantial step. Doc. 96 at 29.

There can be no doubt that the CVRA opened the doors to more victims than had previously been permitted to come before the court under Fed. R. Crim. P. 32. Previously, the right to allocute was limited to victims of crimes of violence and sexual abuse. *See* Fed. R. Crim. P. 32, Committee Notes on Rules—2008 Amendment. But there is no language in the statute that extends this right to anyone and everyone who could arguably have been affected by an accused's behavior during the commission of the federal offense. To the contrary, the statutory language supports the notion that the courts should not look beyond the charged offense when determining who is and who is not a "crime victim" for sentencing purposes. Under the CVRA, M.J. was not a victim of Mr. Jones' offense and the CVRA does not apply to her statement.

18

The admission of this improper victim-impact statement was an abuse of discretion and a procedural error that violated Mr. Jones' right to due process. The Due Process Clause of the Fifth and Fourteenth Amendments forbids sentencing based on inaccurate facts or assumptions. U.S. Const. amends. V, XIV. A sentence based upon material misinformation may violate a defendant's due process rights in some circumstances. *See Roberts v. United States*, 445 U.S. 552, 556, 100 S. Ct. 1358, 1362 (1980); *see also United States v. Reme*, 738 F.2d 1156, 1168 (11th Cir. 1984) (holding that the district court denied the defendant's due process by relying on hearsay statements at sentencing to increase the defendant's sentence).

Similarly, a defendant's right to due process is violated by admission of victim impact testimony that infuses the proceeding with unfairness. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (stating that victim impact evidence that is so unduly prejudicial that it renders a trial fundamentally unfair violates due process). Because M.J.'s statement was unreliable and infused the sentencing with unfairness, Mr. Jones' right to due process was violated and this Court should remand for resentencing. *Reme*, 738 F.2d at 1167 (stating that if the defendant shows

19

that the sentencing court relied on evidence that is materially false or unreliable, and such evidence actually served as the basis for the sentence, remand for a new sentencing hearing is appropriate).

Mr. Jones objected to the admission of M.J.'s victim impact statement because she was not a victim in this case. Doc. 96 at 35, 42. For reasons described above, she was not a victim. Moreover, her unsworn statement was unreliable and infused the sentencing with unfairness. M.J. did little more than rehash the parties' divorce and become an opportunity for her to vent about their relationship and the contentious child custody and legal proceedings surrounding the dissolution of their marriage. Doc. 96 at 36-43. More than half of her statement did not relate to Mr. Jones' possession of ricin, but was instead about their relationship and divorce. *Id.* at 36-40. It is no more than an inflammatory, unsworn, unreliable statement that violated Mr. Jones' right to due process. Moreover, Mr. Jones did not have an opportunity to address the veracity of her statements regarding his behavior during their relationship, such as that he mentally abused her and her children. *Id.* at 36.

The district court took M.J.'s statement, and the fear instilled in her, into consideration in varying upward to the statutory maximum sentence. *Id.* at 62. As a result, the statement and the district court's consideration of it violated Mr. Jones' right to due process. The sentence should therefore be vacated and this case remanded for resentencing.

## II. Mr. Jones' sentence is substantively unreasonable because the district court relied on an improper factors in varying upward.

District courts must impose sentences that are sufficient—but not greater than necessary—to comply with the factors and purposes set forth in 18 U.S.C. § 3553(a)(2), which include the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public. *See United States v. Plate*, 839 F.3d 950, 957 (11th Cir. 2016).

The district court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guidelines range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution. *Id.*

Although district courts have considerable discretion in applying these factors and imposing a sentence, a district court abuses that discretion when it: (1) fails to consider relevant factors that were due significant weight; (2) gives significant weight to an improper or irrelevant factor; or (3) commits a clear error of judgment in considering the proper factors. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010). "As for the third way that discretion can be abused, a district court commits a clear error of judgment when it considers the proper factors but balances them unreasonably." *Id.* This Court will vacate a district court's sentence if it is left with a definite and firm conviction that the district court committed a clear error of judgment in weighing the factors. *Id.* at 1190.

Here, the district court abused its discretion by giving significant weight to improper factors—first, the victim-impact statement and second, Mr. Jones' arrests for domestic violence—when imposing a substantial upward variance. Specifically, the court emphasized the violent nature of Mr. Jones' criminal history, relying on objected-to facts underlying his domestic violence arrests. Doc. 96 at 62.

22

**A.    The district court improperly relied on a non-victim statement when varying upward**

M.J. was permitted to speak at length about her relationship with Mr. Jones on topics unrelated to Mr. Jones' possession of either a firearm or ricin, including allegations regarding Mr. Jones' divorce from his previous wife. Doc. 96 at 36-40. This statement was not subject to cross-examination and was an otherwise unreliable account of her opinion on Mr. Jones, her relationship with him, and their divorce. It infused the sentencing proceeding with unfairness. *Payne*, 501 U.S. at 825.

The district court based its sentencing decision on this improper statement by taking M.J.'s anxiety into account when varying upward. *Id.* at 62 ("But in weighing what an appropriate sentence is, you know, I look at the guidelines, your conduct in this case, the fear that you instilled, the fact that you're putting the public as well as Ms. Jones in danger, and you score 37 to 46 months, and I just—to me, that does not adequately reflect the seriousness of the offense in this case."). Because this was an improper factor, the district court abused its discretion by considering it and Mr. Jones' sentence is substantively unreasonable.

23

**B.    The district court improperly relied on unproven facts contained in arrest records when varying upward**

A defendant's arrest record is an improper factor on which to base an upward variance. Arrest records do not reflect on a defendant's "background, character, or conduct," 18 U.S.C. § 3661, because they are unreliable indicators of the defendant's guilt or prior conduct. Instead, consideration of a bare arrest record perverts due process's requirement that a sentence be based on facts proven by a preponderance of the evidence and "open[s] the sentencing door to raw speculation." *United States v. Berry*, 553 F.3d 273, 281 (3d Cir. 2009) (discussing *United States v. Watts*, 519 U.S. 148, 151–52 (1997)).

Both the Sentencing Guidelines and this Court have recognized the inherent unreliability of an arrest record. Under the Sentencing Guidelines, courts "shall not . . . consider []" a defendant's prior arrest record when determining whether to depart upward. USSG § 4A1.3(a)(3). And the Eleventh Circuit has held the same. *See United States v. Williams*, 989 F.2d 1137, 1142 (11th Cir. 1993) ("[A] district court may not consider 'a prior arrest record itself' when departing from the guidelines."). "This is because an arrest record standing alone is not sufficiently reliable to support a departure." *Id.*

24

Additionally, although a court may consider the reliable factual allegations underlying a defendant's arrest, such as uncontested summaries in the PSR, *id.*, the summaries included in the PSR here were contested, Doc. 96 at 8-9, 58. Mr. Jones repeatedly objected to the paragraphs and the government's reliance on the facts alleged in connection with his arrests because he disagreed with the factual accuracy of the allegations, and no evidence was presented by the government to support the allegations. *Id.*

The district judge overruled the objection, stating she did not really intend to give any weight to the disputed facts. *Id.* at 9. But, the allegations of domestic violence contained in those paragraphs were a significant basis for the government's request for an upward variance, *see id.* at 53-54, and later factored heavily into the district court's decision to impose a sentence more than two and a half times longer than the upward end of Mr. Jones' guidelines, *id.* at 62.

The district judge stated that the upward variance was granted in part based on his prior convictions being "crimes of violence." *Id.* at 62; *see also* Doc. 85 at 4. There is no indication that the district court used

this as a term of art in connection with, for example, imposition of a sentence under the ACCA, which was not at issue in this case.

Moreover, the conclusion that he was convicted of a crime of violence is not supported by any reliable evidence. Nothing in the PSR or during sentencing indicated his prior convictions were violent. The PSR contains no details as to the facts underlying his 1991 convictions. *Id.* ¶¶ 64-71. The facts underlying his 1993 convictions relating to checks are non-violent. *Id.* ¶¶ 72-73.

Mr. Jones objected to considering facts alleged by his ex-wife in connection with his 2008 conviction for criminal mischief and 2013 conviction for telephone harassment because no evidence supported those allegations. *Id.* ¶¶ 74-75; Doc. 96 at 56-57. However, the district court seemed to be under the impression that his domestic violence arrests were scored in the PSR, even though the only crimes listed as domestic violence were mere arrests. Doc. 96 at 58-59 (stating domestic violence is "scored as it should be scored"); PSR ¶¶ 77-78. Thus, the only allegations of violence were in connection with objected-to facts based on arrest records. Doc. 96 at 56-57.

Reliance on the arrest records thus an abuse of discretion. *Cf. United States v. Foley*, 946 F.3d 681, 686 (5th Cir. 2020) ("Generally, 'no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.' 18 U.S.C. § 3661. However, we have routinely held that it is improper for the district court to rely on a 'bare' arrest record in the context of sentencing following a criminal conviction." (alteration adopted) (internal quotation marks omitted)).

The district court's sentence resulted from a variance, not a departure. *See* Doc. 85. But as the First Circuit recently explained, in the context of arrest records, there is no principled distinction between a departure and a variance. There, in an earlier case, the circuit held "as a matter of judicial policy" that reliance on a bare arrest record to impose a "variant sentence of 72 months" was plain error because "proof only of arrest is no proof of guilt." *See United States v. Marrero- Pérez*, 914 F.3d 20, 22–23 (1st Cir. 2019). Though somewhat unclear, the sentence in that case appeared to be an upward departure. *Compare id.* at 22 (noting that

sentencing court stated defendant's record called for "upward departure"), *with id.* (describing sentence as "upward variance").

As the First Circuit later explained, however, the distinction was likely immaterial because the reasoning behind prohibiting reliance on arrest records applies equally to both variances and departures:

If some future case turned on it, it's not clear the departure-variance distinction would hold up as a viable limit on *Marrero-Pérez. See United States v. Ríos-Rivera*, 913 F.3d 38, 45 (1st Cir. 2019) ("[T]here is no discernible difference between departure and variance sentences.") (citing *United States v. Santini-Santiago*, 846 F.3d 487, 489–90 (1st Cir. 2017)). Anyway, § 4A1.3(a)(3) and *Marrero-Pérez* both rest on a basic principle equally applicable here: a bare arrest or charge does not prove the defendant committed the crime. *See Marrero-Pérez*, 914 F.3d at 23 (holding that "no weight should be given in sentencing to arrests not buttressed by independent proof of conduct" because "proof only of an arrest is no proof of guilt").

Here, too, there is no reason to distinguish between an upward variance and an upward departure based on Mr. Jones' arrest record. Both mechanisms share the same flaw: they increase his sentence based

on inherently unreliable information, because an arrest tells the court nothing about his prior conduct or behavior. *See United States v. Arroyo-Jaimes*, 608 F. App'x 843, 848 (11th Cir. 2015) ("[T]he same considerations of fairness and due process apply whenever a sentence is increased. It is the fact of the increase based upon inadequate evidence, not the mechanism by which the increase is accomplished that offends due process." (quoting *Berry*, 553 F.3d at 284)). Yet the court here relied heavily on this inherently unreliable information when it increased his punishment. To do so was an abuse of discretion.

Mr. Jones acknowledges that this Court has suggested reliance on an arrest record in the context of an upward variance is permissible. *See, e.g.*, *United States v. Webman*, 760 F. App'x 904, 907 (11th Cir. 2019) ("The district court made clear that the 110-month sentence was an upward variance, not an upward departure, and could therefore properly consider information such as Webman's juvenile and arrest records—though the district court's statements at sentencing show that it relied almost exclusively on Webman's adult convictions when it explained the

basis for the variance imposed.").[2] *But see Arroyo-Jaimes*, 608 F. App'x at 850 ("To be sure, sentencing courts have been granted broad discretion to consider a defendant's background when imposing a sentence— including *conduct* that did not result in a conviction." (emphasis added)).

He urges this Court, however, to join the circuits recognizing that an arrest record is simply not a proper factor on which to sentence a defendant. *See, e.g., United States v. Díaz-Lugo*, 963 F.3d 145, 153 (1st Cir. 2020) ("[W]hen an arrest has not ripened into a conviction, a sentencing court may not rely on that arrest in a manner that equates the arrest with guilt. Nor may a sentencing court rely on an arrest record as evidence of a defendant's conduct in the absence of some reliable indication that the underlying conduct actually occurred." (citation omitted)); *United States v. Windless*, 719 F.3d 415, 420–21 (5th Cir. 2013)

---

[2] Even in *Webman*, however, it appears the district court looked not just to the defendant's arrest record but to reliable facts regarding the conduct underlying the arrest, as the district court noted that "many of his convictions and arrests involved violent *conduct*." 760 F. App'x at 906 (emphasis added); *see also United States v. Quiroz*, 430 F. App'x 782, 784 (11th Cir. 2011) (noting that district court's consideration of arrests and convictions did not render sentence substantively unreasonable because a court may "consider any relevant information on 'background, character, and conduct,' including *conduct* not resulting in a conviction" (quoting *United States v. Tome*, 611 F.3d 1371, 1379 (11th Cir. 2010)) (emphasis added)).

(holding that district court erred by relying on bare arrest record to justify high-end guideline sentence and special conditions of supervised release); *Berry*, 553 F.3d at 281–85 (holding that district court erred by considering bare arrest record, noting it did not matter that sentence was not an upward departure and cautioning that reliance on length of defendant's arrest record may "exacerbate sentencing disparities arising from economic, social, and/or racial factors" because a "record of a prior arrest may . . . be as suggestive of a defendant's demographics as his . . . potential for recidivism or . . . past criminality"); *United States v. Bailey*, 547 F.2d 68, 71 (8th Cir. 1976) ("The sentencing judge may look at an arrest record for background information. The sentencing judge, however, must not equate arrests as evidence of prior wrongdoing.").

In sum, the district court heavily relied objected-to facts from Mr. Jones' arrests in varying upward to the statutory maximum sentence. Mr. Jones' criminal history appears quite different when these facts are not considered. This error was exacerbated by the district court's reliance on a victim-impact statement that painted Mr. Jones as a dangerous psychopath. Taking these errors into account, individually or cumulatively, the Court "cannot be certain as to whether the district

court would have imposed the same sentence absent the arrests." *Windless*, 719 F.3d at 421. Accordingly, this Court should vacate Mr. Jones' sentence and remand for resentencing.

## III.    Mr. Jones' § 922(g)(1) conviction should be vacated because the statute is unconstitutional under the Second Amendment facially and as applied to Mr. Jones.

The Second Amendment to the United States Constitution states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "There seems no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). "[T]he Amendment's operative clause . . . 'guarantee[s] the individual right to possess and carry weapons in case of confrontation' that does not depend on service in the militia." *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). Protection of the right to possess a handgun exists both inside and outside a person's home. *Id.* at 2122 (holding "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home");

*Heller*, 554 U.S. at 635 (holding that a "ban on handgun possession in the home violates the Second Amendment").

**A.    The Supreme Court's decision in *Bruen* overhauled the analysis employed to determine whether a regulation is unconstitutional under the Second Amendment and abrogated this Court's Second Amendment precedent.**

To determine whether government action infringes on the Second Amendment, the Eleventh Circuit and other federal courts of appeals articulated a two-step test based on the Supreme Court's decision in *Heller*. *See GeorgiaCarry.Org. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012) (citing *Heller*, 554 U.S. at 626). Under this test, the first question was "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* (quoting *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)).

If the law burdened conduct covered by the Second Amendment, courts would move to the second step of applying an appropriate form of means-end scrutiny. *Id.* The level of scrutiny depended on "the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010).

In a watershed opinion, the Supreme Court rejected any form of means-end scrutiny in connection with a Second Amendment analysis. *Bruen*, 142 S. Ct. at 2127. The Court delineated the correct standard for analyzing Second Amendment challenges. Although the Court maintained a two-step standard, in which courts first determined whether the regulated conduct falls within "the Second Amendment's plain text," it eliminated any use of means-end scrutiny. *Id.* at 2126. Instead, the Supreme Court held the second step requires "the government [to] affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

*Bruen* provided guidance for applying these steps. At the first step, determination of whether regulated conduct is protected is done through a "'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language." *Id.* (quoting *Heller*, 554 U.S. at 576-77, 578). If the conduct falls within the plain text, it is presumptively protected by the Second Amendment. *Id.* at 2126.

At the second step, the scope of the right is "confirmed by the historical background of the Second Amendment" by examination of "a

34

variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification." *Id.* at 2127-28 (emphasis in *Bruen*) (quotations omitted). The second step requires an examination of the nation's "well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 2138.

The Supreme Court recognized two potential modes of analysis at this step. In cases where the "challenged regulation addresses a general societal problem that has persisted since the 18th century," the analysis is "straightforward." *Id.* at 2131. In such cases:

> [T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.*

Other cases, however, may "implicat[e] unprecedented societal concerns or dramatic technological changes" and "may require a more nuanced approach." *Id.* at 2132. In such cases, "th[e] historical inquiry that courts must conduct will often involve reasoning by analogy . . . ." *Id.* "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* (quoting C. Sunstein, *On Analogical Reasoning*, 106 Har. L. Rev. 741, 773 (1993)).

In either case, the burden falls squarely on the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. If the government cannot do so, the regulation cannot survive.

Regardless of which analysis applies in a given case, the Supreme Court was clear that the second step did not involve any means-end scrutiny, and that such scrutiny was not appropriate in the Second Amendment context. *Id.* at 2127. The Court explained that "[t]he Second Amendment is the very product of an interest balancing by the people" and thus "demands our unqualified deference." *Id.* at 2131 (quotations

and emphasis omitted). So even if a firearm restriction *could* satisfy an "interest-balancing inquiry," the "very enumeration of the right takes [it] out of the hands of government." *Id*. at 2129 (quotations omitted). Thus, the Court expressly rejected the second step that was previously articulated by this Court and other courts in connection with challenges under the Second Amendment. *Id*. at 2129.

This new framework changes the analysis previously adopted by this Court. Although the first step pre- and post-*Bruen* involves evaluating whether conduct falls within the scope of the Second Amendment's protection, the regulated conduct was previously viewed as something that had to be weighed against governmental interests; now it is presumptively protected unless that conduct was historically regulated, regardless of current governmental interests. *Id*. at 2129. This recasting of the analysis is a fundamental change that abrogated this Court's pre-*Bruen* Second Amendment law. *United States v. Rahimi*, 61 F.4th 443, 450-51 (5th Cir.), *writ of cert. granted*, 2023 WL 4278450 (June 30, 2023) (stating that *Bruen* clearly fundamentally changed the Fifth Circuit's analysis of laws that implicate the Second Amendment and rendered the circuit's "prior precedent obsolete"); *see also Miller v.*

37

*Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (citing Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989)) (stating that lower court decisions are abrogated by Supreme Court decisions that employ a new mode of analysis); *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (discussing the standard for abrogation of prior precedent).

Mr. Jones recognizes that this Court previously held that "statutory restrictions of firearm possession, such as § 922(g)(1), are a constitutional avenue to restrict the Second Amendment right of certain classes of people" and that § 922(g)(1) was constitutional even when applied to a felon who possessed "a firearm purely for self defense." *United States v. Rozier*, 598 F.3d 768, 770-71 (11th Cir. 2010). That decision, however, predates *Bruen* and employs the now-abrogated mode of analysis previously used by this Court. The decision did not follow the standard delineated by *Bruen* for applying the Second Amendment; it did not assess whether the conduct prohibited by § 922(g)(1) fell within the purview of the Second Amendment, or whether the statute was consistent with historical regulation of firearms. Nor did the Court discuss whether felons were among "the people" as that term is used in

the Second Amendment. Because this is the analysis required by *Bruen*, the decision in *Rozier* as to the constitutionality of § 922(g)(1) under the Second Amendment is abrogated and the Court should revisit the issue anew.

**B. The plain text of the Second Amendment covers the conduct underlying Mr. Jones' § 922(g)(1) conviction.**

As is relevant here, § 922(g)(1) makes it unlawful for a person to possess a firearm. Specifically with respect to Mr. Jones, the statute makes it unlawful for a person who knows he has been convicted of a felony to possess a firearm, regardless of whether that person has had other civil rights restored, and without consideration of the nature of the underlying felony or whether the felony occurred decades earlier. A historical analysis consistent with *Bruen* shows possession of such firearms is protected conduct.

*Bruen*'s first analytical step—determining whether the regulated conduct is covered by the plain text of the Second Amendment—has two components. First, the Court must decide whether the individual "is among 'the people' whom the Second Amendment protects." *Heller*, 554 U.S. at 579. If so, then the Court turns to the second step, which is

whether the plain text of the Second Amendment protects that individual's proposed course of conduct. *Bruen*, 142 S. Ct. at 2134.

### 1.    Mr. Jones is among the people whom the Second Amendment protects.

Mr. Jones is a lifelong citizen and member of the community residing in the United States. PSR at 2. Although he has previously been convicted of felonies, the Governor of Virginia recognized he "rejoined society free from state supervision" and had the "political disabilities" caused by his convictions (including denial of the rights to vote, hold public office, serve on a jury, and be a notary public) removed. PSR ¶¶ 64-73; Doc. 72-1 at 3. The restoration of rights admittedly excluded the ability to ship, transport, possess or receive firearms. Doc. 72-1 at 3.

Mr. Jones is among "the people" who enjoy protection under the Second Amendment notwithstanding his prior felony conviction. The phrase "the people" in the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. As Justice, then Judge, Barret has recognized, felons are not "categorically excluded from our national community" and fall within the amendment's scope. *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting).

Indeed, as *Heller* explained, 'the people' is a "term of art employed in select parts of the Constitution," including "the Fourth Amendment, . . . the First and Second Amendments, and . . . the Ninth and Tenth Amendments." 554 U.S. at 579-80. Indisputably, felons are among "the people" whose "persons, houses, papers, and effects" enjoy Fourth Amendment protection. U.S. Const. Amend. IV; *United States v. Lara*, 815 F.3d 605, 609 (9th Cir. 2016). Felons likewise enjoy "the right of the people" to "petition the government for redress of grievances." U.S. Const. Amend. I; *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017). If a person with a felony conviction is one of "the people" protected by the First and Fourth Amendments, *Heller* teaches that such a person is one of "the people" protected by the Second Amendment too. *Range v. United States Att'y Gen.*, 69 F.4th 96, 102 (3d Cir. 2023) (*en banc*).

This understanding is also consistent with the plain meaning of the word "people" at the time the Bill of Rights was adopted, which was defined as "[t]he body of persons who compose a community, town, city or nation"—a term "comprehend[ing] all classes of inhabitants." II Noah Webster, *An American Dictionary of the English Language* (1828). The Second Amendment does not draw a felon/non-felon distinction, and as

41

the Eleventh Circuit and other Courts of Appeals have recognized, there is no felon/non-felon distinction with the term "people" in the Second Amendment. *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022); *see also United States v. Meza-Rodriguez*, 798 F.3d 664, 671 (7th Cir. 2015).

The Third Circuit recently "reject[ed] the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment." *Range*, 69 F.4th at 103. That is because "the enshrinement of constitutional rights necessarily takes certain policy choices off the table," including which citizens are protected by the Second Amendment. *Id.* (quoting *Heller*, 554 U.S. at 636).

Moreover, courts should not rely on dicta, and particularly a phrase as expansive and vague as "law-abiding, responsible citizens," to bar all persons convicted of a felony from protection by the Second Amendment. *Range*, 69 F.4th at 102; *see also United States v. Bullock*, --- F. Supp. 3d ---, 2023 WL 4232309, at *18-19 (S.D. Miss. 2023) (noting that the Supreme Court's statements as to "law-abiding, responsible citizens" and felon disarmament were no more than dicta that the Supreme Court

stated could be addressed at a later date when the issue was actually before the Court). "[T]oday, felonies include a wide swath of crimes, some of which seem minor," while "some misdemeanors seem serious." *Range*, 69 F.4th at 102 (footnotes omitted). Broadly barring all people convicted of felonies from exercising a constitutional right gives too much authority to legislators to decide whom to exclude from a constitutional right. *Id.* at *5.

And, indeed, Mr. Jones' conviction under § 922(g)(1) was based on his prior convictions in 1991 and 1993 for grand larceny (3 counts), breaking and entering (four counts), uttering a forged check (1 count), and a bad check (two counts). Doc. 53. These convictions were nearly 30 years old at the time he possessed firearms in this action, and all other civil rights had been restored. Based on these facts, Mr. Jones is certainly among "the people" who enjoy protection under the Second Amendment.

### 2. Mr. Jones' proposed course of conduct falls within the Second Amendment's plain text.

Mr. Jones' conduct included the possession of a handgun and a rifle. Doc. 55. The conduct of possessing handguns and rifles, both within and outside of the home, is protected by the Second Amendment. *Heller*, 554 U.S. at 636; *Bruen*, 142 S. Ct. at 2134; *Range*, 69 F.4th at 103. Because

this conduct falls within the Second Amendment's plain text, it is presumptively lawful. *Bruen*, 142 S. Ct. at 2126; *Bullock*, 2023 WL 4232309, at *21.

**C.    The government cannot show an American tradition that an individual with Mr. Jones' criminal history may never again possess any firearms or ammunition.**

Once both components of the first analytical step are satisfied, the Court advances to *Bruen*'s second step. There, the burden shifts to the government to demonstrate that its regulation "is consistent with the Nation's historical tradition of firearms regulation." *Bruen*, 142 S. Ct. at 2130. This requires the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. Additionally, because the "general societal problem" that § 922(g)(1) is designed to address—i.e., felons with access to guns—is one "that has persisted since the 18th century," *Bruen*, 142 S. Ct. at 2131, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation," *id.*

The government cannot meet this burden. Section 922(g)(1) is a total and permanent ban prohibiting all individuals convicted of any

felony from possessing any firearms for any reason. As is relevant here, it prohibits Mr. Jones from possessing a rifle and handgun based on felony convictions for grand larceny, breaking and entering, and bad checks that were nearly 30 years old. Doc. 53. Neither the federal government nor any state government historically stripped all persons convicted of any felony from ever possessing a firearm in the future.[3] *See, e.g.*, *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting); Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374, 1376 (2009).

Founding-era categorical exclusions on the right to keep and bear arms show the common concern was not firearm possession by felons or "even criminals in general," but rather possession by those who

---

[3] Indeed, such laws did not exist until the 20th century. The modern version of § 922(g)(1) was adopted approximately 177 years after the Second Amendment. See Public Law 90-351, 82 Stat. 197, 236 (June 19, 1968). The first state law to bar possession of firearms by persons convicted of a crime was passed in 1885, and that law was limited to the arms on the person at the time of arrest—it did not address future possession. *See* Catie Carberry, *Felons and Persons with a Mental Impairment*, Second Thoughts: A Blog from the Center for Firearms Law at Duke University (June 27, 2019), *available at* https://firearmslaw.duke.edu/2019/06/miniseries-part-iii-felons-and-persons-with-a-mental-impairment/. There is not a law banning felons from possessing firearms until 1914. *Id.* Neither of these laws demonstrate a historical tradition as is required under *Bruen*.

"threatened violence and the risk of public injury." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting); *see id.* at 454–57 (Barrett, J., dissenting) (providing historical overview). As then-Judge, now-Justice Barrett summarized: "[F]ounding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety. But neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons." *Id.* at 458 (Barrett, J., dissenting); *see Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 914-15 (3d Cir. 2020) (Bibas, J., dissenting).

Additionally, consequences for non-capital felony convictions during the Eighteenth and Nineteenth Centuries did not always result in "civil death" or a permanent loss of civil rights. "Felons serving a term of years did not suffer civil death; their rights were suspended but not destroyed. In sum, a felony conviction and the loss of all rights did not necessarily go hand-in-hand." *Kanter*, 919 F.3d at 461 (Barrett, J., dissenting); *see also Folajtar*, 980 F.3d at 924 ("Historically, it is true that felons had no right to guns while they were jailed and awaiting execution. But that 'civil death' does not fit long after a nondangerous felon reenters

society. And most felonies today are far less serious than capital crimes.").

Moreover, history shows that felons were prohibited from exercising certain rights that could belong only to "virtuous" citizens. *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). These "virtue exclusions are associated with civic rights—individual rights that require citizens to act in a collective manner for distinctly public purposes." *Id.* (alteration adopted) (internal quotation marks omitted). Examples of "civic" rights include the right to vote and to serve on a jury. *Id.* The Supreme Court, however, has rejected the argument that the Second Amendment protects a "civic" right. *Id.* at 463 (Barrett, J., dissenting) (relying on *Heller*, 554 U.S. at 595). Moreover, "virtue" exclusions were explicit, as reflected in early state constitutions prohibiting felons from voting, for example. But no historical provisions expressly deprived felons of the right to keep and bear arms. *See id.* at 464 (Barrett, J., dissenting). Thus, disarming felons is not supported under a historical "virtue" theory. *See Folajtar*, 980 F.3d at 915-19 (Bibas, J., dissenting).

Colonial and Founding-era practice also suggests that committing a serious crime did not result in a permanent disarmament. For example,

leaders of the seminal Massachusetts Bay colony once disarmed supporters of a banished seditionist. Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020) (citations omitted). Nevertheless, "[s]ome supporters who confessed their sins were welcomed back into the community and able to retain their arms." *Id.* And in 1787, after the participants in Shay's Rebellion attacked courthouses, a federal arsenal, and the Massachusetts militia, they were barred from bearing arms, for three years. *Id.* at 268–67. These more targeted laws do not support § 922(g)(1)'s permanent ban for all felons and are certainly not "distinctly similar historical regulation[s]." *Bruen*, 142 S. Ct. at 2131.

The same is true of 19th-century history. For example, in the Nineteenth Century, Congress passed a bill disbanding organized militia forces in states of the former Confederacy but removed a provision seeking to disarm such individuals "in the face of opposition from several (northern) senators that to disarm the citizens from whom the militia was drawn, rather than merely disbanding the militias, would violate the Second Amendment." *Whether the Second Amendment Secures an*

*Individual Right*, 28 Op. O.L.C. 126, 226 (2004). Likewise, a Texas Court of Appeals struck down a Texas law ordering the disarming of people convicted of unlawfully using a pistol. *Jennings v. State*, 5 Tex. Ct. App. 298, 298 (1878). In doing so, the court stated:

> The Legislature has the power by law to regulate the wearing of arms, with a view to prevent crime, but it has not the power to enact a law the violation of which will work a forfeiture of defendant's arms. While it has the power to regulate the wearing of arms, it has not the power by legislation to take a citizen's arms away from him. One of his most sacred rights is that of having arms for his own defence and that of the State. This right is one of the surest safeguards of liberty and self-preservation.

*Id.* at 300-01. Although this case dealt with the Texas constitution and not the Second Amendment, the analysis indicates how firmly states believed that everyone had a fundamental, preexisting right to own firearms for self-defense—even those who had misused firearms in the past. And, indeed, 1870s Texas otherwise imposed strict firearms regulations. *Bruen*, 142 S. Ct. at 2153.

Although the government may argue that, historically, *some* jurisdictions *sometimes* regulated firearm use by those considered *presently* violent. But that is not a "distinctly similar historical regulation," *Bruen*, 142 S. Ct. at 2131, for at least three reasons. First,

49

not all people with a felony conviction are presently violent. Second, the historical regulations required an individualized assessment of a person's threat to society. And finally, the historical regulations almost always allowed people deemed violent to still possess weapons for self-defense. Thus, even those convicted of serious crimes–including rebellion–remained entitled to protect themselves in a dangerous world, with firearms if necessary. Those laws' targeted nature makes them a far cry from declaring that any person, convicted of any felony, can never possess "the most popular weapon chosen by Americans for self defense in the home." *Heller*, 554 U.S. at 629.[4]

In sum, there was no historical tradition of gun regulations "distinctly similar" to § 922(g)(1) as it is applied to Mr. Jones based on his decades-old felony convictions—and certainly the government cannot meet its burden of establishing that there was. *Cf. Range*, 69 F4th at 106 (concluding the government failed to show the nation's historical tradition of firearms regulations supported depriving a defendant

---

[4] Even if such restrictions create ambiguity, they are insufficient for the government to meet its burden. *Bruen*, 142 S. Ct. at 2139, 2141 n.11. A single state's statute or a "pair of state-court decisions" cannot outweigh "the overwhelming weight of other evidence." *Id.* at 2153. Nor is a handful of outliers. *Id.* at 2149, 2155.

convicted of making a false statement to obtain food stamps in 1995 from the Second Amendment's right to possess a firearm); *Bullock*, 2023 WL 4232309, at *30-31 (concluding the government did not show a history and tradition of felon disarmament so as to show § 922(g)(1) was constitutional as applied to a defendant with a 15-year-old convictions for aggravated assault and manslaughter) As such, § 922(g)(1) is unconstitutional facially and as applied to Mr. Jones and his conviction must be vacated.

## IV. For purposes of further review, Mr. Jones' conviction under § 922(g)(1) should be vacated because the statute exceeds Congress's authority under the Commerce Clause.

The statute criminalizing possession of a firearm as a convicted felon is unconstitutional, facially and as applied, because the statute exceeds Congress's authority under the Commerce Clause. *See* U.S. Const. art. I, § 8, cl. 3. Congress's Commerce Clause powers do not permit it to criminalize the intrastate possession of a firearm simply because it crossed state lines in the past. Recognizing his Commerce Clause challenges are foreclosed by precedent holding "that a defendant's possession of a firearm that had traveled in interstate commerce in the past was sufficient to satisfy the interstate commerce element . . . and

sufficient to satisfy the requirements of the Commerce Clause," *United States v. Pritchett*, 327 F.3d 1183, 1185 (11th Cir. 2003), Mr. Jones respectfully maintains that § 922(g)(1) is unconstitutional for purposes of further review.[5]

### A.    Section 922(g)(1) is facially unconstitutional.

The Commerce Clause does not grant Congress "a general police power of the sort retained by the States." *United States v. Lopez*, 514 U.S. 549, 567 (1995); *see also United States v. Morrison*, 529 U.S. 598, 606-09 (2000). Instead, Congress's commerce power is limited to three categories: (1) the "channels of interstate commerce," (2) the

---

[5] *See, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1980 n.1 (2019) (Thomas, J., concurring) ("By legislating beyond its limited powers, Congress has taken from the People authority that they never gave . . . . Indeed, it seems possible that much of Title 18, among other parts of the U.S. Code, is premised on the Court's incorrect interpretation of the Commerce Clause and is thus an incursion into the States' general criminal jurisdiction and an imposition on the People's liberty."); *United States v. Seekins*, 52 F.4th 988, 989 (5th Cir. 2022) (Ho, Smith, Engelhardt, JJ, dissenting from denial of rehearing en banc) ("For too long, our circuit precedent licenses the federal government to regulate the mere possession of virtually every physical item in our nation—even if it's undisputed that the possession of the item will have zero impact on any other state in the union. The federal government just has to demonstrate that the item once traveled across state lines at some point in its lifetime, no matter how distant or remote in time. . . . That is no limit at all.").

"instrumentalities of interstate commerce," and (3) "activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59. The scope of the third category was at one point not clear, with confusion existing as to "whether an activity must 'affect' or 'substantially affect' interstate commerce to be within Congress' power to regulate it under the Commerce Clause." *Id.* at 559. In *Lopez*, however, the Court "confirm[ed] [the congressional power under the Commerce clause] is subject to outer limits" and held "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* at 556-57, 559. The Supreme Court used this framework to strike down the Gun-Free School Zones Act, 18 U.S.C. § 922(q), which prohibited possession of a firearm in a school zone. *Id.* at 551-52.

Section 922(g)(1) fares no better. The provision prohibits possession—a non-economic activity—and does not ensure the activity 'substantially affects' interstate commerce. *Id.* at 559, 561, 567; *Morrison*, 529 U.S. at 610-12. Indeed, the jurisdictional elements set forth in both provisions fail to "ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Lopez*, 514 U.S. at

53

561. Section 922(g)(1) is, therefore, facially unconstitutional. *Id.* at 561-68; *Morrison*, 529 U.S. at 610-19.

## B.    Section 922(g)(1) is unconstitutional as applied.

Section 922(g)(1) is also unconstitutional as applied to Mr. Jones' intrastate possession. Mr. Jones was convicted under § 922(g)(1) on the basis that the firearms he possessed were "in or affecting interstate commerce" because they were at some point shipped in interstate commerce. Doc. 55 at 2, 23; Doc. 94 at 5. But, the government did not establish any connection, let alone a substantial connection, between the charged offense of possession and interstate or foreign commerce. As a result, Mr. Jones' convictions under this statute are unconstitutional.

Mr. Jones recognizes that this Court has affirmed § 922(g)(1) convictions based on *Scarborough v. United States*, 431 U.S. 563 (1977), which construed § 922(g)(1)'s predecessor. *United States v. Wright*, 607 F.3d 708, 715-16 (11th Cir. 2010). But *Scarborough* is a statutory interpretation decision, not a constitutional one. *Scarborough*, 431 U.S. at 567, 569-77; *see Seekins*, 52 F.4th at 991 (Ho, Smith, Engelhardt, JJ, dissenting from denial of rehearing en banc). In addition, the Supreme Court decided *Scarborough* before its decision in *Lopez*, which cabined

54

the constitutional power of the federal government under the Commerce Clause. *Lopez*, 514 U.S. at 568. The statement in *Scarborough* that Congress gave no indication that it "intended to require any more than the minimal nexus that the firearm have been, at some point, in interstate commerce," 431 U.S. at 575, falls far short of the *Lopez* Court's clarification "that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce," 514 U.S. at 559. *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (Demoss, J., dissenting) (noting the conflict between *Scarborough* and *Lopez*); *see also Alderman v. United States*, 131 S. Ct. 700, 703 (2011) (Thomas, J., dissenting from the denial of a petition for writ of certiorari) ("Fifteen years ago in *Lopez*, we took a significant step toward reaffirming this Court's commitment to proper constitutional limits on Congress' commerce power. If the *Lopez* framework is to have any ongoing vitality, it is up to this Court to prevent it from being undermined by a 1977 precedent that does not squarely address the constitutional issues."). Accordingly, Mr. Jones maintains that § 922(g)(1) is unconstitutional as applied.

56

**CONCLUSION**

For the foregoing reasons, Mr. Jones' § 922(g)(1) conviction, and his sentence, should be vacated and this case remanded.

Respectfully submitted,

A. Fitzgerald Hall, Esq.
Federal Defender
Middle District of Florida

*/s/ Laura J. Daines*
Laura J. Daines, Esq.
Assistant Federal Defender
Florida Bar No. 105060
400 N. Tampa Street, Ste. 2700
Tampa, Florida 33602
Tel: (813) 228-2715
Fax: (813) 228-2562
E-Mail: laura_daines@fd.org
Counsel for Appellant

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

In accordance with Fed. R. App. P. 32(g)(1), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this brief contains 11,376 words according to Microsoft Word's word count, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

*/s/ Laura J. Daines*
Laura J. Daines
Assistant Federal Defender

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2023, a true copy of the foregoing Initial Brief of Appellant was filed using the Court's Electronic Case Filing system, which will send notification to Germain M. Seider, Assistant United States Attorney.

*/s/ Laura J. Daines*
Laura J. Daines
Assistant Federal Defender