IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

APPEAL NO. 23-10227-DD
_____

UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

KEVIN JONES

Defendant-Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF FLORIDA

_____

REPLY BRIEF OF APPELLANT

_____

A. Fitzgerald Hall, Esq.
Federal Defender
Middle District of Florida

Laura J. Daines, Esq.
Assistant Federal Defender
Florida Bar No. 105060
400 North Tampa Street,
Suite 2700
Tampa, Florida 33602
Telephone:     (813) 228-2715
Facsimile:     (813) 228-2562
E-Mail: laura_daines@fd.org
Counsel for Appellant

## Appeal No. 23-10227-DD

### *United States of America v. Kevin Jones*

#### CERTIFICATE OF INTERESTED PERSONS

The Certificate of Interested Persons disclosed in Mr. Jones' principal brief (11th Cir. Doc. 18) is complete.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## TABLE OF CONTENTS

**Contents**  **Page(s)**

Certificate of Interested Persons .................................................... C1 *of* 1

Table of Contents .........................................................................i

Table of Authorities........................................................................iii

Arguments and Citations of Authority ..................................................... 1

   I.   The district court abused its discretion and violated Mr. Jones' right to due process by allowing an improper and unduly prejudicial victim impact statement ........................................... 1

  II.  Section 922(g)(1) is unconstitutional, facially and as applied to Mr. Jones..................................................................... 3

      A. Mr. Jones's Second Amendment claim is jurisdictional .... 3

      B. This Court's decision in *Rozier* was abrogated by *Bruen* .. 8

      C. The Second Amendment does not protect only law-abiding, responsible citizens or exclude felons .............................. 11

         i.   Felons are among "the people" protected by the Second Amendment................................................. 11

        ii.   The Legislature does not have the power to determine who is among "the people"....................................... 18

       iii.   The Second Amendment did not codify a right that was always understood to exclude felons................ 19

      D. The laws cited by the government are not analogous to § 922(g)(1) under the *Bruen* test ......................................... 22

TABLE OF CONTENTS – *CONT'D*

## Contents                                              Page(s)

Conclusion ..................................................................... 27

Certificate of Compliance ............................................. 28

Certificate of Service .................................................... 28

## TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Class v. United States*, 138 S. Ct. 798 (2018) ......................................3, 5

*District of Columbia v. Heller*, 554 U.S. 570

   (2008) ........... 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22

*Folajtar v. Att'y Gen. United States of Am.*, 980 F.3d 897

   (3d Cir. 2020) .................................................................................... 19

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)........................ 18, 20, 21, 23

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)................................. 18

*National Socialist Party of America v. Skokie*, 432 U.S. 43, 97 S. Ct.

   2205, 53 L. Ed. 2d 96 (1977)............................................................. 14

*New York State Rifle & Pistol Association, Inc. v. Bruen*,

   142 S. Ct. 2111 (2022) ........... 6, 7, 8, 9, 10, 11, 15, 16, 17, 22, 23, 24

*Payne v. Tennessee*, 501 U.S. 808 (1991).....................................................3

*Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023), *pet.*

   *for writ of cert. filed*, No. 23-374 (Oct. 10, 2023)...... 7, 11, 18, 19, 26

*United States v. Bullock*, --- F. 3d ---, 2023 WL 4232309

   (S.D. Miss. 2023) .............................................................. 9, 22, 25

## TABLE OF AUTHORITIES - *CONT'D*

**Cases** **Page(s)**

*United States v. Focia*, 869 F.3d 1269 (11th Cir. 2017)................... 10, 11

*United States v. Frazier*, 605 F.3d 1271 (11th Cir. 2010)........................8

*United States v. Grigg*, 434 F. App'x 530 (6th Cir. 2011)........................2

*United States v. Iguaran*, 821 F.3d 1335 (2016)......................................5

*United States v. Rahimi*, 61 F.4th 443 (5th Cir.)

    *pet. for writ of cert. granted,* 143 S. Ct. 2688 (2023)............ 7, 11, 22

*United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) ............ 8, 9, 10, 11

*United States v. Saac*, 632 F.3d 1203 (11th Cir. 2011) ........................3, 5

*United States v. Shrader*, No. 1:09-0270, 2010 WL 4781625,

    (S.D.W.V. Nov. 16, 2010)..................................................................2

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ......................12

*United States v. Wilson*, 979 F.3d 889 (11th Cir. 2020) ......................5, 6

*United States v. Wilson*, Nos. 17-12379 & 18-14680, 2019 WL 3451253,

    (11th Cir. July 26, 2019) ..................................................................5

*United States v. Zinn*, 321 F.3d 1084 (11th Cir. 2003)............................1

*Van Buren v. United States*, 141 S. Ct. 1648 (2021)..............................17

iv

## TABLE OF AUTHORITIES – *CONT'D*

**Statutes**                                                                   **Page(s)**

18 U.S.C. § 922 .................. 6, 7, 8, 9, 10, 11, 13, 14, 25, 26, 27, 28, 29, 30

**U.S. Constitution**

U.S. Cons. Amend. II................................................................. 12

**Federal Rules**

Fed. R. App. P. 27 ...................................................................28

Fed. R. App. P. 32 ...................................................................28

**Other Authorities**

Bernard Schwartz, *The Bill of Rights: A Documentary History* 665

  (1971)..................................................................................20

ARGUMENTS AND CITATIONS OF AUTHORITY

I.    **The district court abused its discretion and violated Mr. Jones' right to due process by allowing an improper and unduly prejudicial victim impact statement.**

M.J. provided an improper and unduly prejudicial victim impact statement that violated Mr. Jones's due process right by infusing unfairness into his sentencing. The district court erred in allowing, and considering, victim impact evidence.

As a preliminary matter, plain-error review is inappropriate. The government incorrectly argues that Mr. Jones did not raise the issue of whether M.J. could testify as a victim below. 11th Cir. Doc. 28 at 57 59. Mr. Jones argued—twice—that M.J.'s statement should be excluded because his crime of possession was victimless. Doc. 96 at 35, 43. Mr. Jones clearly articulated that his objection to M.J.'s victim-impact testimony was based on the argument that the offense did not have a victim. The objection was not obscure and could not be misunderstood. That is the same ground raised in this appeal and was sufficient. *United States v. Zinn*, 321 F.3d 1084, 1087-88 (11th Cir. 2003). So, this Court should review for abuse of discretion.

In sum, the government also argues that the district court has broad discretion to consider relevant information at sentencing so it doesn't matter whether M.J. spoke as a victim or testified as some other type of witness. 11th Cir. Doc. 28 at 56-57, 60. But whether M.J. spoke at sentencing as a victim instead of as any other type of witness is procedurally significant. *United States v. Shrader*, No. 1:09-0270, 2010 WL 4781625, at *3 (S.D.W.V. Nov. 16, 2010). As one court has explained, "[i]t is apparent that a victim has the right to speak at sentencing about the impact a defendant's criminal conduct has had upon her without being placed under oath and cross examined just as a defendant has the right to allocute in mitigation of sentence." *Id.*; *see also United States v. Grigg*, 434 F. App'x 530, 533 (6th Cir. 2011) (affirming the denial of the defendant's request that victims take an oath because there is not such requirement in the Crime Victims' Rights Act).

Unsworn victim impact statements, therefore, are not the same as other witness testimony that may shed light on the defendant's background, character, or conduct. That is reflected in M.J.'s statement here. Although she is purportedly a victim of Mr. Jones' possession of ricin, she devoted a large portion of her statement to disputes during

2

their separation that predated his possession of ricin. This unsworn statement had much to do with her feelings about their relationship, and little to do with how Mr. Jones's possession of ricin impacted her. By allowing such a statement, the sentencing was infused with unfairness in violation of Mr. Jones's right to due process. *Cf. Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (explaining that a defendant's right to due process is violated by victim impact evidence that is so unduly prejudicial that it renders the trial fundamentally unfair).

## II.    Section 922(g)(1) is unconstitutional, facially and as applied to Mr. Jones.

### A.    Mr. Jones's Second Amendment claim is jurisdictional.

Mr. Jones's Second Amendment claim should be reviewed de novo. The government incorrectly argues Mr. Jones's Second Amendment claim should be reviewed for plain error. 11th Cir. Doc. 28 at 26-27. In *United States v. Saac*, 632 F.3d 1203, 1208 (11th Cir. 2011), the Court recognized "[t]he constitutionality of [the statute of conviction] is a jurisdictional issue the defendants did not waive upon pleading guilty." *Id.*; *see also Class v. United States*, 138 S. Ct. 798, 803 (2018) (holding that the defendant did not waive a challenge to the constitutionality of the statute of conviction by pleading guilty).

3

Although the government argues that *Saac* is distinguishable because it dealt with an unconventional statutory scheme requiring the district court to make a preliminary determination regarding subject matter jurisdiction, *see* 11th Cir. Doc. 28 at 27-28, the decision in *Saac* regarding the jurisdictional nature of a constitutional challenge did not turn on the language in that statutory scheme. Rather, in *Saac*, "the government argue[d] that defendants' voluntary, unconditional guilty pleas prevent[ed] them from challenging the constitutionality of [the statute]." 632 F.3d at 1208. Without discussing any oddities of that statute, the Eleventh Circuit examined whether the defendants waived any argument that the statute was unconstitutional by pleading guilty. *Id.* The Court held they did not, reasoning that "[a] defendant's claim that the indictment failed to charge a legitimate offense is jurisdictional and is not waived upon pleading guilty." *Id.* The Court explained that "[e]ven if defendants are factually guilty of [the statutory] violations, the government would lack the power to prosecute if Congress exceeded its authority in enacting [the statute]." Here, Mr. Jones makes just such an argument: Congress exceeded its authority by enacting § 922(g)(1) in violation of the Second Amendment.

4

Indeed, a constitutional challenge to the statute of conviction—unlike a constitutional challenge to the process resulting in the conviction—"call[s] into question the Government's power to constitutionally prosecute him." *Class*, 138 S. Ct. 805 (quotation marks and citation omitted). Such a constitutional challenge questioning the government's power to prosecute has jurisdictional significance. *Saac*, 632 F.3d at 1208. Accordingly, this Court should review Mr. Jones's constitutional challenge to the statute of conviction as it reviews all jurisdictional challenges: de novo. *United States v. Iguaran*, 821 F.3d 1335, 1336 (2016).

The government relies on this Court's decision in *United States v. Wilson*, 979 F.3d 889, 903 (11th Cir. 2020), for its incorrect position. There, this Court rejected the defendant's argument that federal courts lacked subject matter jurisdiction to penalize wholly intrastate conduct involving firearms, *see* Initial Br. of Appellant, *United States v. Wilson*, Nos. 17-12379 & 18-14680, 2019 WL 3451253, at *35-37 (11th Cir. July 26, 2019). That is not Mr. Jones's argument here. Instead, Mr. Jones argues that § 922 (g)(1) is unconstitutional because it infringes his individual right under the Second Amendment to possess a weapon.

Moreover, the argument in *Wilson* was reviewed *de novo* because that is the standard applied to questions regarding subject matter jurisdiction and the constitutionality of a statute. 979 F.3d at 902 n.6.

Regardless, even if this Court imposed a plain error standard, Mr. Jones would still prevail. Section 922(g)(1) is unconstitutional under the plain text of the Second Amendment and the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), as clarified by *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). In interpreting the Second Amendment, the Supreme Court has emphasized that courts must give effect to the plain language of the amendment. *Heller*, 554 U.S. at 576-77. In doing so, *Heller* directs that "the people" includes all citizens, "not an unspecified subset," and there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." 554 U.S. at 579, 581. And, more recently, *Bruen* clarified that a person's Second Amendment rights cannot be limited unless the government shows the limitation is consistent with this nation's history and tradition of firearms regulations. 142 S. Ct. at 2127. Both cases make plain that the conduct of possessing a weapon, whether within or outside the home, for self-

6

defense is conduct protected by the Second Amendment. *Heller*, 554 U.S. at 592; *Bruen*, 142 S. Ct. at 2156.

For reasons described below, *Heller*, *Bruen*, and the text of the Second Amendment establish that Mr. Jones is among "the people" afforded Second Amendment protection. *United States v. Rahimi*, 61 F.4th 443, 451 (5th Cir.), *pet. for writ of cert. granted*, 143 S. Ct. 2688 (2023); *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101-103 (3d Cir. 2023), *pet. for writ of cert. filed*, No. 23-374 (Oct. 10, 2023). His conduct, possession of a firearm, is presumptively protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2135. Further, the government did not and cannot show that § 922(g)(1) is consistent with the nation's history and tradition of firearms regulations. *See infra* at II.D. It was an error for the district court to convict Mr. Jones for violating § 922(g)(1) in the absence of the government meeting its burden of demonstrating the regulation is consistent with this nation's history and tradition of firearms regulations. And, under *Heller*, *Bruen*, and the Second Amendment, that error is plain.

This error affected Mr. Jones's substantial rights—he stands convicted and is serving a 120-month sentence under an unconstitutional

statute. Doc. 84; *see United States v. Frazier*, 605 F.3d 1271, 1283 (11th Cir. 2010) ("A substantial right is affected if the appealing party can show that there is a reasonable probability that there would have been a different result had there been no error.") (citation omitted). And, Mr. Jones's conviction for a crime based on a regulation that impermissibly infringes on Second Amendment rights seriously affects the fairness, integrity, or public reputation of judicial proceedings. As a result, Mr. Jones prevails even under the plain error standard. Thus, under de novo or plain error review, this Court should vacate Mr. Jones's § 922(g)(1) conviction and sentence.

## B. This Court's decision in *Rozier* was abrogated by *Bruen*.

Contrary to the government's position, *Bruen* abrogated this Court's decision in *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010). The government argues *Rozier* is binding and has not been abrogated by *Bruen* because *Rozier* did not engage in means-end scrutiny and is consistent with *Bruen*'s analysis of text and history framework. 11th Cir. Doc. 28 at 35-36. Not so. The government's argument fails to account for how *Bruen* reframed the entire Second Amendment analysis, including

8

how to fundamentally approach Second Amendment issues, which undermined *Rozier* to the point of abrogation.

*Bruen* rejected the threshold analysis applied in *Rozier*. *Bruen* requires consideration of two factors: (1) whether the Second Amendment's plain text covers an individual's conduct, and (2) if so, whether the government justified its regulation by demonstrating consistency with the historical tradition of firearm regulation. Both are absent in *Rozier*.

First, *Rozier* had no focus on the plain text of the Second Amendment and believed *Heller* to stand for the proposition "that the first question to be asked is not whether the handgun is possessed for self-defense or whether it is contained within one's home, rather the inicial question is whether one is *qualified* to possess a firearm." *Id.* at 770. This Court stated "Rozier's Second Amendment right to bear arms is not weighed in the same manner as that of a law-abiding citizen, such as the appellant in *Heller*." *Id.* at 771.Under *Bruen*, however, the first question is whether the conduct regulated is covered by the Second Amendment's plain text. *United States v. Bullock*, --- F. 3d ---, 2023 WL 4232309, at *20 (S.D. Miss. 2023).

Second, *Rozier* was not, and did not purport to be, either a textual analysis of whether felons are among "the people" protected by the Second Amendment, or an historical analysis of whether they were traditionally barred from firearm possession. This Court did not analyze any longstanding, distinctly or relevantly similar laws of disarming felons when deciding that "statutory restrictions of firearm possession, such as § 922(g)(1), are a constitutional avenue to restrict the Second Amendment right of certain classes of people." *Id.* Because that is explicitly what *Bruen* requires, the decision in *Rozier* has been abrogated.

The government seeks to rely on the analysis in *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017), which is cited in *Bruen*, to argue *Rozier* remains good law. 11th Cir. Doc. 28 at 36. But, *Bruen*'s citation to *Focia* did not affirm that case or its reasoning, let alone that of *Rozier*. Instead, *Bruen* cited to *Focia* for the simple proposition that circuit courts adopted a two-step test, with the first step requiring courts to "ascertain the original scope of the [Second Amendment] right based on its historical meaning." *Bruen*, 142 S. Ct. at 2126. The Court described this step as "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127.

10

This is far from affirming that *Focia*, or even the first step, was consistent with the new framework announced by *Bruen*.

The decision in *Rozier* "has fallen unequivocally out of step with some intervening change in law." *Rahimi*, 61 F.4th at 450. The Supreme Court has "fundamentally change[d] the focus of the relevant analysis" for Second Amendment challenges. *Id.*; *see also Range*, 69 F.4th at 101 (recognizing that *Bruen* abrogated the Third Circuit's Second Amendment jurisprudence). *Rozier* has therefore been abrogated, and this Court should revisit whether § 922 (g)(1) is constitutional under the Second Amendment.

### C.    The Second Amendment does not protect only law-abiding, responsible citizens or exclude felons.

#### i.    Felons are among "the people" protected by the Second Amendment.

The government's argument that felons categorically fall outside "'the people' protected by the Second Amendment," Doc. 28 at 41, cannot be squared with *Heller*. The Supreme Court held in *Heller* that the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation" independent of militia service. 554 U.S. at 592, 624. Integral to the Court's reasoning and

ultimate holding was an analysis of the Second Amendment's text, including its use of the term "the people." The Court recognized "the people" as a term of art in the Bill of Rights meaning "persons who are part of a national community or who have otherwise developed sufficient connection with this county to be considered part of that community." *Id.* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Although the Second Amendment's prefatory clause references the "Militia," which "in colonial America consisted of a subset of 'the people'—those who were male, able bodied, and within a certain age range," *id.*—this tension confirmed that the prefatory clause did not limit the operative clause: "the right of *the people* to keep and bear Arms." U.S. Cons. Amend. II (emphasis added). Rather, the prefatory clause's reference to militia merely announced the purpose for which the right was codified. *Heller*, 554 U.S. at 578-81, 598-600.

The textual analysis of the Second Amendment's operative clause created "a strong presumption that the Second Amendment right is exercised individually," and that, at a minimum, "belongs to *all* Americans." *Id.* at 581 (emphasis added). Combined with the common meaning of the phrase "keep and bear arms," which includes possessing

and using arms for personal purposes, the operative clause "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592. This meaning is "confirmed" by the Second Amendment's historical background because "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *Id.*

*Heller's* discussion of "the people" was integral to its reasoning and ultimate holding. And *Heller* unambiguously held that "the people" in the Second Amendment, like "the people" in the First and Fourth Amendments, includes all members of our national community, "not an unspecified subset." *Id.* at 580.

Nonetheless, the government argues that the Second Amendment "codified a preexisting right to bear arms that covered only law-abiding, responsible citizens, and therefore excluded convicted felons . . . ." 11th Cir. Doc. 28 at 39-40. To support this argument, the government cherry-picks language from *Heller* about the protection afforded to law-abiding and responsible citizens. When this language is read in context, however, it gives no suggestion that the Second Amendment is limited to such individuals.

For example, in one reference to law-abiding and responsible citizens in *Heller*, the Supreme Court criticized a dissenting opinion that proposed an interest-balancing inquiry. In doing so, the Court stated:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. We would not apply an "interest-balancing" approach to the prohibition of a peaceful neo-Nazi march through Skokie. *See National Socialist Party of America v. Skokie*, 432 U.S. 43, 97 S. Ct. 2205, 53 L. Ed. 2d 96 (1977) *(per curiam)*. The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong headed views. The Second Amendment is no different. Like the First, it is the very *product* of an interest balancing by the people—which Justice BREYER would now conduct for them anew. And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*Heller*, 554 U.S. at 634-35.

This reference to "law-abiding, responsible citizens" is merely a description of the *Heller* plaintiff, who was a law-abiding and responsible

14

individual that sought to possess firearms for self-defense within his home. *Id.* at 575. This does not suggest, as the government proposes, that the Supreme Court intended to limit the Second Amendment to such individuals.

If the Court had intended its decision in *Heller* to demarcate the outside bounds of the Second Amendment, the decision in *Bruen*—which extends *Heller*—would make no sense. In *Bruen*, the Supreme Court extended Second Amendment protections to carrying a weapon outside the home for self-defense. The Court reasoned that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." 142 S. Ct. at 2134-35. Critically, *Bruen* explained that *Heller* had not passed on the issue, and that its "remark[s]" about the preeminence of the need for self-defense in the home "did not suggest that the need was insignificant elsewhere." *Id.* at 2135 (citation omitted).

Likewise, *Heller* did not pass on the issue of whether the Second Amendment applies to individuals who are not, like the *Heller* plaintiff, law-abiding responsible citizens. Rather, the Supreme Court recognized that its decision in *Heller* neither clarified the entire field of Second

Amendment law nor examined whether there were historical justifications for the regulations *Heller* described as "permissible." Those issues were not before the Court. 554 U.S. at 635. *Heller*'s reference to law-abiding and responsible individuals, therefore, should not be used to suggest the Second Amendment right is "insignificant elsewhere." *Bruen*, 142 S. Ct. at 2135.

Just as *Heller* did not limit Second Amendment rights to within the home, *Bruen* did not limit the Second Amendment to law-abiding, responsible citizens. *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun."). The government relies on the Court's use of the phrase "law-abiding, responsible citizen" to suggest *Bruen*'s holding incorporated being law-abiding and responsible as limitations to the Second Amendment's applicability. 11th Cir. Doc. 8 at 44-45. Although *Bruen*, like *Heller*, also references "law-abiding, responsible citizens," 142 S. Ct. at 2122, 2134, 2156, those references again simply reflect the plaintiffs' uncontested status as "law-abiding, responsible citizens," *id.* at 2124-25. Because the plaintiffs in *Bruen* were "law-abiding, adult citizens of Rensselaer County, New York," *id.*, the

16

question presented to the Supreme Court was limited to such individuals. There was no need to address the scope of the Second Amendment right in connection with any other member of "the people," so the Court did not do so. *Cf. Van Buren v. United States*, 141 S. Ct. 1648, 1660 (2021) (recognizing the Court was not bound to follow dicta from a prior case that did not pass on a particular issue).

So, *Heller* and *Bruen* did not narrow Second Amendment protection to only law-abiding citizens as the government suggests. The cases do not even define "law-abiding," let alone provide any textual or historical justification for the purported narrowing of "the people." This confirms that the Court's references to "law abiding" people were not meant to narrow the scope of the Second Amendment. It is inconceivable that the Court would exclude, in such a summary fashion, an entire, yet undefined, class of people from the purview of a long-neglected fundamental constitutional guarantee. This is especially true given the Court's insistence that such a guarantee not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780

17

(2010). Yet that is precisely the result that would follow under the government's truncated view of "the people."

The view that non-law-abiding people "fall entirely outside the Second Amendment's scope" is not only "at odds with *Heller* itself," but is also "an unusual way of thinking about rights." *Kanter v. Barr*, 919 F.3d 437, 452-53 (7th Cir. 2019) (Barrett, J., dissenting). Typically, a deprivation of rights "occurs because of state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional constraints)." *Id.* Limiting "the people" to law-abiding individuals, by contrast, strips the right "as a self-executing consequence of [a person's] new status," regardless of any legislative determination regarding the appropriate deprivation. *Id.* at 452. And it further deprives the person of standing to assert a constitutional claim because his status automatically removes him from the Second Amendment's scope. *Id.* The correct inquiry is "whether the government has the power to disable the exercise of a right that [the people] otherwise possess, rather than whether they possess the right at all." *Id.* at 453; *see also Range*, 69 F.4th at 102 (agreeing with then-Judge Barrett's dissent in *Kanter*).

### ii. **The Legislature does not have the power to determine who is among "the people."**

18

The government suggests that the scope of the Second Amendment left to legislatures to decide. 11th Cir. Doc. 28 at 41 ("Legislatures have historically had wide latitude to exclude felons from the political community."). That cannot be the so. As the Supreme Court has told us: "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope is too broad." *Heller*, 554 U.S. at 634-35.

And, indeed, that approach of extreme deference would "give[] legislatures unreviewable power to manipulate the Second Amendment . . . ." *Range*, 69 F.4th at 103 (quoting *Folajtar v. Att'y Gen. United States of Am.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting)). "[T]hat deference would contravene *Heller*'s reasoning that 'the enshrinement of constitutional rights necessarily takes certain policy choices off the table.'" *Id.* (quoting *Heller*, 554 U.S. at 636).

### iii. The Second Amendment did not codify a right that was always understood to exclude felons.

Another government argument to categorically exclude felons from Second Amendment protection is that the Amendment codified a

19

preexisting right historically understood to be limited to law-abiding people. This argument relies on laws that stripped individuals of political or civic rights, the English Declaration of Rights, and a proposal made during the Constitution's ratification debates that the right to bear arms be guaranteed "unless for crimes committed, or real danger of public injury." 11th Cir. Doc. 28 at 42-43 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971)). None of these sources support the government's argument.

First, although the government is correct that history "show[s] that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous citizens," "*Heller* . . . expressly reject[ed] the argument that the Second Amendment protects a purely civic right." *Kanter*, 919 F.3d at 462-63 (Barrett, J., dissenting). Instead, the Second Amendment protects an individual right of self-defense, rather than a right to serve in a well-regulated militia. *Id.* at 463. And, these types of "virtue exclusions from the exercise of civic rights were explicit. If the right to bear arms was similarly subject to a virtue exclusion, we would expect to see provisions expressly depriving felons of that right too—but we don't." *Id.*

20

Second, the English Declaration of Rights doesn't show that "the people" historically and categorically excluded all felons. It states: "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by law." 11th Cir. Doc. 28 at 42-43 (quoting *Heller*, 554 U.S. at 593, 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). The government interprets that provision to "reveal[] an understanding that the legislature could 'determine which citizens could 'have arms . . . by Law.'" *Id.* at 43.

Significantly though, the Second Amendment does not contain any such restrictions, let alone a restriction based on a person's status as a felon. *Kanter*, 919 F.3d at 457 n.5 (Barrett, J., dissenting) ("[T]he right protected by the Second Amendment was decidedly broader than the one protected in the English Bill of Rights."). And, this provision in the Declaration of Rights was included to ensure Protestants would not be disarmed. *Heller*, 554 U.S. at 593 ("[Englishmen] accordingly obtained an assurance from William and Mary, in the Declaration of Rights (which was codified as the English Bill of Rights), that Protestants would never be disarmed[.]"). The purpose of this provision therefore was to protect

the political dissidents' right to arms, rather than limit who could have arms, as the government argues.

Third, the proposed language relied on by the government never became law. *Bullock*, 2023 WL 4232309, at *22 (citing *Rahimi*, 61 F.4th at 457). *"Heller* reminds us that '[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process,' and this is a good example of why that is true." *Id.* (citing *Heller*, 554 U.S. at 590). Different reasons have been proposed for why that language was excluded, and "thoughtful judges and scholars continue to disagree about what the omission means." *Id.* The omission, therefore, does not support the government's argument that the Second Amendment was always intended to categorically exclude all felons.

For these reasons, this Court should reject the government's contention that only "law-abiding, responsible citizens" are among "the people" protected by the Second Amendment.

### D.    The laws cited by the government are not analogous to § 922(g)(1) under the *Bruen* test.

*Bruen* placed the burden of proof on the government to establish that a challenged law "is consistent with this Nation's historical tradition

of firearm regulation." 142 S. Ct. at 2135. If not, such a law is unconstitutional. The government has not met its burden.

As a preliminary matter, § 922(g)(1)'s regulation of access to guns by felons is directed at a longstanding societal problem that existed in the 18th century: regulation of felons' access to guns and the resulting potential danger from such felon access. For such a longstanding societal problem, present when the Second Amendment was ratified, the government must show a robust tradition of "distinctly similar" regulations as of 1791 for the statute to survive. *Bruen*, 142 S. Ct. at 2131.

The government has not done so. As jurists and commentators have repeatedly recognized there were *no* felon disarmament regulations at the time of the Founding. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). This should end the inquiry.

Even pursuing the "more nuanced approach" permitted under *Bruen* for "cases implicating unprecedented societal concerns or dramatic technological changes," the government has not met its burden of producing "relevantly similar" historical regulations. *Bruen*, 142 S. Ct. at 2132. *Bruen* set out several metrics by which the sufficiency of the historical precedent should be analyzed: (1) the historical regulations'

23

temporal proximity to the founding era, (2) their scope and prevalence, and (3) their similarity to the challenged restriction. *Id.* at 2130-34, 2136, 2138. With respect to similarity, *Bruen* tells us that at least two metrics must be considered: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. None of the regulations proposed by the government are sufficiently similar in how and why they burden the right to self-defense to meet the relevantly similar test.

The government argues § 922(g)(1) is analogous to historical laws authorizing capital punishment and estate forfeiture for felony convictions. 11th Cir. Doc. 28 at 49-53.[1] Because those are severe punishments, the government argues they encompass the lesser punishment of forfeiture of the entitlement to possess arms. *Id.* at 50-51. But this comparison misunderstands the metrics of the "relevantly similar" test. *Bruen*, 142 S. Ct. at 2133.

---

[1] The government states that § 922(g)(1) is also consistent with "laws disarming those considered untrustworthy based on lack of adherence to rule of law." Doc. 28 at 49. The government does not elaborate on that assertion, or provide any examples of laws disarming untrustworthy individuals. Instead, it discusses only laws relating to capital punishment and estate forfeiture. *Id.* at 49-53. A vague assertion of a type of law, without specifying any specific laws, is sufficient under *Bruen*. Mr. Jones cannot guess what laws the government is referring to, or address whether they meet *Bruen*'s "relevantly similar" standard.

The government notes that the First Congress "made various felonies punishable by death, including for conduct relating to forging or counterfeiting a public security." 11th Cir. Doc. 28 at 50. It lists other laws that authorized death or estate forfeiture for specific felonies, such as counterfeiting, burglary, robbery, arson, malicious maiming and wounding, and forgery. *Id.* at 50-51. But the government fails to compare these laws to § 922(g)(1), a blanket ban permanently disarming all felons, regardless of their eligibility for the death penalty. *Bullock*, 2023 WL 4232309, at *23. Section 922(g)(1) applies equally to a person recently convicted of, for example, murder, as it does to defendants like Mr. Jones, who had not been convicted of a felony in decades and who'd had his civil rights restored. This is fatal to its burden.

Just because the First Congress authorized death and estate forfeiture for *certain* felonies, does not support a blanket forfeiture of Second Amendment rights for *all* felons. *See id.* ("Does this history mean that persons with felony convictions can be disarmed because some were executed? Or does it mean that disarmament applies only to persons convicted of a death-eligible offense?"). What's more, the meaning of a felony has changed since the Founding. "[T]oday, felonies include a wide

swath of crimes, some of which seem minor." *Range*, 69 F.4th at 102. It therefore is not clear from the government's argument how the death-eligible and estate forfeiture laws it relies on are relevantly similar to § 922(g)(1).

Further, the government's argument fails to show how or why its cited laws burdened a persons' right to self-defense. In rejecting this same argument, the Third Circuit explained:

> The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed. As one of our dissenting colleagues notes, a felon could "repurchase arms" after successfully completing his sentence and reintegrating into society.

*Range*, 69 F.4th at 105. This Court should likewise reject the government's proposition that capital punishment and estate forfeiture laws are analogous to § 922(g)(1).

## CONCLUSION

For the reasons described above and in Mr. Jones's initial brief (Doc. 18), his § 922(g)(1) conviction, and his sentence, should be vacated and this case remanded.

Respectfully submitted,

A. Fitzgerald Hall, Esq.
Federal Defender
Middle District of Florida

*/s/ Laura J. Daines*
Laura J. Daines, Esq.
Assistant Federal Defender
Florida Bar No. 105060
400 N. Tampa Street, Ste. 2700
Tampa, Florida 33602
Tel: (813) 228-2715
Fax: (813) 228-2562
E-Mail: laura_daines@fd.org
Counsel for Appellant

27

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

In accordance with Fed. R. App. P. 32(g)(1), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this brief contains 5,316 words according to Microsoft Word's word count, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

*/s/ Laura J. Daines*
Laura J. Daines
Assistant Federal Defender

**CERTIFICATE OF SERVICE**

I hereby certify that on December 27, 2023, a true copy of the foregoing Reply Brief of Appellant was filed using the Court's Electronic Case Filing system, which will send notification to Germain M. Seider, Assistant United States Attorney.

*/s/ Laura J. Daines*
Laura J. Daines
Assistant Federal Defender